## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**BRANDON MUNDT**,

    **Plaintiff**,

**v.**                           **Case No. 3:24cv82-TKW-ZCB**

**ERIC ADEN**, in his official capacity
as Sheriff, Okaloosa County, Florida,

    **Defendant**.

_____/

## ORDER GRANTING SUMMARY JUDGMENT

This case is before the Court based on Defendant's motion for summary judgment (Doc. 13). Upon due consideration of the motion, Plaintiff's response in opposition (Doc. 20), Defendant's reply (Doc. 21), and the evidence submitted by the parties (attachments to Docs. 12, 15, and 19), the Court finds that the motion is due to be granted.

### Facts

Plaintiff worked for the Okaloosa County Sheriff's Office (OCSO) as a Patrol Deputy from February 2012 until July 2016. He was rehired by OCSO as a Patrol Deputy in March 2019.

All sworn OCSO employees are required to complete and pass a Physical Abilities Test (PAT) at least once during each calendar year. Sworn employees who

are unable to successfully complete the PAT in accordance with OCSO policy may apply for an available non-sworn position for which they are qualified, but if there are no non-sworn positions available, the sworn employee must be terminated. Employees with temporary exemptions from the PAT due to medical leave are required to complete the PAT upon returning to full, unrestricted duty at the next appropriate test date.

In June 2021, Plaintiff was promoted to an Investigator in the Homeland Security component of the Criminal Investigations Division (CID). Maj. Shannon Tait was responsible for the overall supervision of CID.

In June 2022, Plaintiff transferred to the General Investigations component of CID where he was primarily assigned to investigate crimes against children as part of the Special Victims Unit (SVU). His direct supervisor in the SVU was Sgt. Daniel Genrich, but Maj. Tait was still in his chain of command.

Shortly after his transfer to the SVU, Plaintiff began experiencing severe back pain and difficulty moving around. His medical provider prepared a report indicating that Plaintiff could not (1) run after subjects on foot, (2) engage in violent and physical confrontations, (3) physically secure a resisting individual, or (4) perform the essential functions of a law enforcement officer.

On June 15, based on that report, Plaintiff was placed on leave pursuant to the Family and Medical Leave Act (FMLA).[1]  Plaintiff returned to work on July 14 after being cleared by his medical provider to perform the essential functions of his position.

In October 2022, Plaintiff began seeing Dr. Brandon Cook about his continued back pain.  Dr. Cook recommended an L4-L5 laminectomy, which is a surgical procedure to decompress the nerves in the space between the L4 and L5 discs. Plaintiff underwent the procedure on December 1.

On December 7, Ms. James sent Plaintiff a letter explaining that he had been placed on FMLA leave effective December 1.   The letter identified the balance of Plaintiff's remaining FMLA leave (eight weeks) and accrued leave (negative), and it explained that pursuant to OCSO policy, the "failure to return to duty after FML[A] has been exhausted may be treated as a resignation unless proper notification has been received."  The letter also informed Plaintiff that he could "request an extension of leave as long as [he had] accrued leave available to support the absence for a maximum of 180 days," and that he could apply for any open

---

[1]    Although Plaintiff testified that he believed that he was taking advanced medical leave rather than FMLA leave, the record refutes that understanding because an OSCO human resources employee, Doris James, emailed Plaintiff on June 23 informing him that the leave would be designated as FMLA leave.

position for which he qualified if he was unable to return to full duty in his current role.

Plaintiff continued to monitor his cases while he was on leave, but Sgt. Genrich had to reassign some of his cases to other investigators. The SVU was short-staffed at the time and the investigators had higher than normal caseloads,[2] which impacted the timeliness and completion of the investigations assigned to the unit. The cases could not be assigned to other units because SVU investigations involved high-priority cases that required specialized knowledge and training.

On January 5, 2023, Plaintiff was examined by Cali Wilson, Dr. Cook's physician assistant. Ms. Wilson reported in the medical records that Plaintiff's "pain is much better," but she also noted that Plaintiff "will have to do a physical abilities test immediately when he returns back to work and I do not think he is ready for this yet." Ms. Wilson identfied "a tentative return to work date of 3/14/2022 [sic] for now." Dr. Cook signed and approved the medical note.

Plaintiff promptly informed his supervisors of his "tentative" March 14 return-to-work date. The same day he did so, Maj. Tait checked on Plaintiff via Facebook.

---

[2] There were only eight investigators assigned to SVU, and during January and February 2023, there were multiple SVU investigators in addition to Plaintiff who were out for scheduled leave, sick leave, training, and FMLA leave. Additionally, one investigator was injured in the line of duty on January 21 and was not scheduled to return until mid-April.

Maj. Tait asked Plaintiff if he would consider taking a non-sworn position as a dispatcher until he was medically cleared to return as an investigator. Plaintiff said he "appreciate[d] the info" and "I totally don't expect my current spot to be heald [sic] that long I know someone has to fill it."

Plaintiff exhausted his FMLA leave on January 28. He had not yet been released to work at that point.

On February 8, Ms. James asked Plaintiff to provide an updated work status report from his medical provider. The report Plaintiff provided indicated that he was still unable to return to work and it listed an expected return-to-work date of "3/14/22 [sic] tbd."

Later that day, Plaintiff submitted a formal request "to take more leave." The request provided "a current return to work date of March 14, 2023," and it explained that he was still recovering from his surgeries[3] and was "unable to lift more than 5 pounds or do any strenuous activity." The request also stated that "[t]he Doctors have told me the March 14, 2023 [date] is tentative pending what they believe is right for me to be signed off on as they are familiar with the PAT course requirements for us."

---

[3] Plaintiff had a second surgery about two weeks after the L4-L5 laminectomy because of an infection and complications arising from the laminectomy.

The following day (February 9), Ms. James sent a letter to Dr. Cook's office detailing the job description and physical requirements of Plaintiff's position and asking for clarification on the report that Plaintiff provided on February 8.  The letter asked whether Plaintiff could perform his essential job functions and, if not, when he would be able to do so without restrictions.  Dr. Cook answered "No, likely 3/14/23."

A few days later, Ms. James emailed Capt. Matt Abbott and asked him to explain to Plaintiff that his medical provider needed to "opine to a full-duty return date of March 14, 2023" or Plaintiff would "be offered the opportunity to apply for a non-sworn position for which he qualifies[.]"  Ms. James explained that Plaintiff could re-apply for sworn position when he was medically cleared to fulfill the requirements of a sworn officer.

On February 16, Plaintiff was again evaluated by Ms. Wilson.  She noted in the medical records that Plaintiff "will have to do a physical abilities test immediately when he returns back to work and I do not think he is ready for this yet."  Ms. Wilson also noted that "[w]e will plan for a tentative return to work date of 3/14/22 [sic] for now."  Dr. Cook signed and approved the medical note.

That same day, Maj. Tait and Capt. Abbott informed Plaintiff that he had to return to work by March 14, voluntarily resign and apply for a non-sworn position,

or be terminated.  Maj. Tait told Plaintiff that he needed to decide by February 20 as to whether he would apply for a non-sworn position or be terminated.

The following morning (February 17), Plaintiff emailed Maj. Tait asking why he had to decide whether to apply for a non-sworn position or resign by February 20 instead of March 14.  Maj. Tait explained that Plaintiff's "FML exhausted January 28, 2023" and "[t]he most updated correspondence from your doctor says likely 03/14/2023."  Maj. Tait told Plaintiff that he was "out of time" but "we would be more than happy to extend a non-sworn position in hopes that once you are cleared can come back to Deputy Sheriff status."

A non-sworn position would have been a demotion for Plaintiff, so he determined it was not in his best interest to voluntarily accept the position.  Instead, on February 18, Plaintiff again requested accommodation in the form of a leave extension until his "likely return date of March 14th, 2023."

On February 19, OCSO General Counsel Marsha Weaver reviewed the request and sent an email to Undersheriff Charlie Nix.  Ms. Weaver explained that Plaintiff "exhausted his FMLA at the end of January" and he is "out of any available leave time."  She further explained that even after an extension to his most recent doctor's appointment, "his doctor did not find that he can perform the physical requirements of a deputy sheriff" and his doctor could not provide a return date that was any more definitive than "likely."  Ms. Weaver recommended that Plaintiff's

request for an extension of his leave be denied and that Undersheriff Nix "proceed as previously stated to [Plaintiff] and with our normal practice of offering a non-sworn position with the hopes that he can return to a sworn position soon."

Later that day, based on Ms. Weaver's recommendation, Undersheriff Nix formally denied Plaintiff's request for an extension of his leave.

The following day (February 20), Maj. Tait reiterated to Plaintiff that his options were to either voluntarily resign and accept a non-sworn position until he was medically cleared to return or be terminated.  Plaintiff declined the non-sworn position and was terminated from his position on February 22 for failure to return to work after expiration of all available FMLA leave and accrued leave.

On March 7, Plaintiff was again examined by Ms. Wilson.  He testified that he was cleared to return to work without any restrictions by Ms. Wilson at this appointment.

The medical record from the March 7 appointment contained a note written by Ms. Wilson (and signed and approved by Dr. Cook) stating that Plaintiff is "still having quite a bit of leg pain and states his legs give out on him" and that "[h]e will have to do a physical abilities test immediately when he returns back to work and I do not think he is ready for this yet."  The medical record also stated that "[w]e were planning on a tentative return to work date of 3/14/2022 [sic] however he states since last visit he has been fired from his job."

Plaintiff continued to see Dr. Cook over the next 6 months. The medical note from the June 1 appointment reiterated the concern that Plaintiff was still not yet ready for the PAT test that he would have to complete upon returning to work, and the medical note from the September 5 appointment stated that Plaintiff reported that he was "still having quite a bit of pain" and that "his legs give out on him."

Dr. Cook testified that he was not aware of Plaintiff ever being designated as physically able to return to work, and in July 2024, Plaintiff reported to a pain management physician that his pain "was more or less unchanged" from what it was before his December 2022 surgery.

### Procedural History

In December 2023, Plaintiff filed suit against Defendant in state court. The complaint asserted four claims: disability discrimination under the Americans with Disabilities Act (ADA) (Count I); retaliation under the Florida Civil Rights Act (FCRA) (Count II); violation of the FMLA (Count III); and retaliation under Florida's Workers' Compensation Law (Count IV).

Defendant removed the case to this Court in February 2024 based on federal question jurisdiction and answered the complaint. The parties then engaged in a period of discovery, which closed in August 2024.

After discovery closed, Defendant filed a motion for summary judgment on all claims asserted in the complaint. The motion is fully briefed and is ripe for a ruling. No hearing is needed to rule on the motion.

## Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "material" if it would change the outcome of the litigation, and a dispute about a material fact is "genuine" if the evidence is such that it could lead a reasonable factfinder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). The Court's role at the summary judgment stage is not to weigh the evidence, but rather to "conclude whether [the evidence] is so one-sided that the result of any trial is inevitable." *Turner v. Phillips*, 2022 WL 458238, at *4 (11th Cir. Feb. 15, 2022). Thus, when ruling on a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

10

**Analysis**

Defendant argues that he is entitled to summary judgment on all of the claims asserted in the complaint. Plaintiff did not respond to Defendant's argument on the worker's compensation retaliation claim in Count IV, so he is deemed to have abandoned that claim. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014). Each of the remaining counts will be addressed in turn.

<u>Count I – Disability Discrimination Under the ADA</u>

"The ADA bars employers from 'discriminat[ing] against a qualified individual on the basis of disability.'" *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1191 (11th Cir. 2024) (alteration in original) (quoting 42 U.S.C. §12112(a)). Where, as here, there is no direct evidence[4] of discrimination, the Court applies "the same *McDonnell Douglas* burden-shifting framework that often applies in Title VII claims." *Id.* That framework "allows the plaintiff to establish a prima facie case of disability discrimination using circumstantial evidence." *Id.*

"To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that at the time of the adverse employment action, []he (1) had a disability, (2) was a qualified individual, and (3) was subjected to unlawful

---

[4] "Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption" and "is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (cleaned up).

discrimination because of [his] disability." *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018). Here, it is undisputed that Plaintiff had a disability, but the other elements are in dispute.

*Qualified Individual*

Under the ADA, a qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). Thus, if the individual cannot perform an essential function of his position even with a reasonable accommodation, he is not a "qualified individual" and he cannot establish a prima facie case of disability discrimination. *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

Here, it is undisputed that successful completion of the PAT was an essential function of any OCSO sworn position, including the Investigator position that Plaintiff held at the time he was fired. It is also undisputed that Plaintiff was unable to successfully complete the PAT on February 22 when he was fired. Thus, Plaintiff was not a "qualified individual" unless he would have been able to successfully complete the PAT if he had been given his requested accommodation of a return-to-work date of March 14.

Plaintiff argues that there is evidence from which a jury could find that he could have successfully completed the PAT on March 14—namely his testimony

that Ms. Wilson cleared him to return to unrestricted duty at the March 7 appointment. Defendant responds that Plaintiff's testimony is refuted by the contemporaneous medical record from that appointment, which stated that Plaintiff "is not ready for [the PAT] yet." The Court agrees with Defendant.

A party's sworn testimony is enough to properly deny summary judgment, even if it is self-serving, unless "it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law[.]" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *see also Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301, 1311 (S.D. Fla. 2020) (granting summary judgment when plaintiff's testimony was squarely contradicted by the uncontroverted documentary record rendering the testimony implausible), *aff'd*, 855 F. App'x 656 (11th Cir. 2021). Here, Plaintiff's testimony that "[o]n March 7, 2023, Cali Wilson saw me and cleared me to return to work without restrictions," is directly refuted by Ms. Wilson's medical note from that appointment.

Plaintiff's testimony is further refuted by Dr. Cook's medical note from the June 1 appointment (more than three months after Plaintiff was allegedly cleared to return to work), which stated that Plaintiff was "not ready for [the PAT] yet." Moreover, consistent with the medical records, Dr. Cook testified that he was not aware of Plaintiff ever being designated as physically able to return to work.

Under these circumstances, no reasonable jury would find that Plaintiff was released to return to unrestricted duty as of March 14. That being the case, Plaintiff failed to establish that he is a "qualified individual" because he would not have been able to perform the essential functions of his position even with a reasonable accommodation of extended leave until March 14. Accordingly, Plaintiff failed to establish a prima facie case of disability discrimination under the ADA.

### Unlawful Discrimination

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability – unless doing so would create an undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). An accommodation is reasonable only if it enables the employee to perform the essential functions of the job. *Id.* The plaintiff has the burden of identifying that a reasonable accommodation exists and demonstrating that the accommodation allows him to perform the job's essential functions. *Id.* at 1255-56.

Here, for the reasons stated above, Plaintiff has not shown that he has been subject to unlawful discrimination based on the denial of his request for extended leave to March 14 because that accommodation was not a "reasonable accommodation" since it would not have enabled Plaintiff to perform the essential

functions of his job.  Thus, for this additional reason, Plaintiff has not established a

prima facie case of discrimination under the ADA.[5]

\* \* \*

In sum, for the reasons stated above, Plaintiff failed to establish a prima facie

case of discrimination under the ADA.[6]    Accordingly, Defendant is entitled to

---

[5] The Court did not overlook Plaintiff's argument that Defendant failed to engage in the interactive process under 29 C.F.R. §1630.2(o)(3) to determine an appropriate reasonable accommodation.  However, "if the employee does not identify a reasonable accommodation, the employer does not have to enter into an interactive dialogue or show undue hardship," *Webb v. Donley*, 347 F. App'x 443, 446 (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)), and here, Plaintiff did not identify a reasonable accommodation that would have allowed him to perform the essential functions of his position.  Moreover, it is well-established that an employee is merely entitled to a reasonable accommodation, not the employee's preferred accommodation, *see Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997), and here, Plaintiff was repeatedly offered the reasonable accommodation of being reassigned to a non-sworn position until he was able to complete the PAT.  *See* 42 U.S.C. §12111(9)(B) ("The term 'reasonable accommodation' may include … reassignment to a vacant position[.]"); 29 C.F.R. Pt. 1630 App. §1630.2(o) (explaining that "[a]n employer may reassign an individual to a lower graded position if … there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation").  Thus, under these circumstances, no reasonable jury would find that Defendant discriminated against Plaintiff by failing to engage in the interactive process.

[6] Based on this conclusion, the Court need not consider Defendant's argument that Plaintiff's requested accommodation would have created an "undue hardship" for the SVU.  That said, the Court tends to agree with Defendant that extending Plaintiff's leave to March 14 (or beyond) would have caused an undue hardship to the SVU because that unit was already short-staffed and the investigators' higher-than-usual caseloads was impacting the timelines and completion of the unit's cases.  *See Davis v. Columbus Consolidated Gov't*, 826 F. App'x 890, 893 (11th Cir. 2020) (finding no error in district court's conclusion that plaintiff's accommodation would cause an undue hardship based on the impact of the requested accommodation of nine weeks of medical leave on the remaining bus operators who would have to cover Plaintiff's bus routes); *Parker v. Charter Comms., LLC*, 2021 WL 2530985, at *12 (M.D. Fla. June 21, 2021) ("When an accommodation of medical leave would result in other employees having to work longer or harder, such may show that the requested accommodation creates an undue hardship for the employer.").  The fact that Plaintiff's position had been held open since December does not mean that continuing to hold the position open would not create an undue hardship on the SVU.  *See Parker*, 2021 WL 25430985, at *12-13 (rejecting argument that defendant would not suffer undue hardship by continuing to hold position open for plaintiff simply because it held the position open for him

summary judgment on the ADA disability discrimination claim in Count I of the complaint.

<u>Count II – FCRA Retaliation</u>

The FCRA makes it unlawful for an employer to "discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section." §760.10(7), Fla. Stat.  FCRA claims are analyzed under the same legal framework as ADA claims.  *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000).

"Under the FCRA, to make out a prima facie case of retaliation, the plaintiff must show (1) that she engaged in a statutorily protected expression, (2) that she suffered an adverse employment action, and (3) that a causal link existed between the adverse action and her protected expression." *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1336 (11th Cir. 2021).  "[O]nce the prima facie case is established, and the defendant produces a legitimate, [non-retaliatory] reason for an action, the plaintiff must show that the defendant's proffered reason was pretextual."

during his period of accommodated medical leave).  Likewise, the fact that Plaintiff testified that he was monitoring his cases while he was on leave does not account for the fact that his absence and inability to assist with other investigators' cases while they are on leave adversely impacted the SVU.

*Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 928 (11th Cir. 2019). A plaintiff may demonstrate that a defendant's reasons are pretextual "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the defendant's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (cleaned up).

Here, Defendant argues that Plaintiff failed to establish a prima facie case of retaliation because he did not engage in any statutorily protected activity and, even if he did, he failed to establish a causal link between his termination and his protected activity. The Court disagrees with the first point but agrees with the second.

### Statutorily Protected Activity

A plaintiff can show that he engaged in statutorily protected activity by establishing that he made a request for a reasonable accommodation. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). "The employee must have had a good faith, reasonable belief that the activity was protected by the statute." *Monroe*, 793 F. App'x at 928.

Here, Plaintiff requested an accommodation on February 8 when he formally requested an extension of his leave until March 14. A request for an extension of leave for a *definite* duration may be a reasonable accommodation, *see Spears v.*

*Creel*, 607 F. App'x 943, 950 (11th Cir. 2015),[7] and notwithstanding the finding above that the requested accommodation would not have allowed Plaintiff to perform the essential functions of his job, there is nothing to suggest that Plaintiff did not make the request in good faith. Accordingly, Plaintiff's accommodation request is statutorily protected activity.

### Causation

"To establish a 'causal link' for purposes of the third element [of the prima facie case], a plaintiff need only demonstrate 'that the protected activity and the adverse action were not wholly unrelated.'" *Matamoros*, 2 F.4th at 1336 (quoting *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)). "A plaintiff makes this showing if []he provides sufficient evidence that the decisionmaker became aware of the protected conduct and that there was a close temporal proximity between this awareness and the adverse action." *Id.* However, "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

Here, Plaintiff made his formal accommodation request for an extension of leave on February 8. But, under OCSO policy and the December 7 letter that Ms.

---

[7] A request for *indefinite* leave is not a reasonable accommodation, *see Frazier-White*, 818 F.3d at 1256, but that is not what Plaintiff requested.

James sent to Plaintiff when he initially took leave (more than two months before Plaintiff's accommodation request), if Plaintiff failed to return to duty after exhausting his eight weeks of FMLA leave, then his failure to return could be treated as a resignation.[8] Thus, even though Plaintiff was terminated shortly after making a formal accommodation request, the outcome that would result if he did not return to work when his leave was exhausted was communicated to him before he ever made an accommodation request. Stated another way, the close temporal proximity between the accommodation request (February 8) and Plaintiff's termination (February 22) is insufficient to establish causation under the circumstances of this case because the evidence shows that Defendant was merely "proceeding along lines previously contemplated" by terminating Plaintiff when it did.

Accordingly, Plaintiff has not established the causation element of the prima facie case of retaliation.

\*   \*   \*

That said, even if Plaintiff had established a prima facie case of retaliation, Defendant would still be entitled to summary judgment on Count II because he proffered legitimate, non-retaliatory reasons for Plaintiff's termination and there is

---

[8] The letter also informed Plaintiff that he could apply for any open position for which he qualified if he was unable to return to full duty in his current role when his leave expired. That option was repeatedly offered to Plaintiff before his accommodation request and before he was terminated.

no evidence from which a jury could find that those reasons were pretexts for retaliation.   Specifically, Defendant proffered (and the undisputed evidence establishes) that Plaintiff was terminated because (1) his FMLA leave and accrued leave had been exhausted, (2) his medical providers did not find that he was fit to return to full duty as of his most recent medical appointment nor could they provide a definitive return to work date, (3) his continued absence was exacerbating the staffing issues in the SVU, and (4) he refused to accept a non-sworn position until he was medically cleared to return to a sworn position.

The Court did not overlook Plaintiff's argument that Defendant's proffered non-retaliatory reasons for his termination were pretextual because he continued to monitor his cases while on leave and Defendant never sought clarification from his medical providers regarding his "likely" return to work date.   However, that argument is unpersuasive because it is undisputed that the SVU was short staffed and some of Plaintiff's cases had to be transferred to other investigators; that Ms. James repeatedly requested additional information from Plaintiff's medical providers and that they never explicitly cleared him to return to work; and that Defendant consistently adhered to the communicated OCSO policy and repeatedly told Plaintiff his options under that policy.   Thus, at most, Plaintiff has established that he disagrees with Defendant's decision to proceed under the established policy and not grant him an extension.   That is insufficient to establish pretext.

*   *   *

In sum, because Plaintiff failed to establish a prima facie case of retaliation and failed to show that the non-retaliatory reasons proffered by Defendant for his termination were pretextual, Defendant is entitled to summary judgment on the FCRA retaliation claim in Count II of the complaint.

<u>Count III – Violation of the FMLA</u>

"The FMLA entitles employees to take leave for certain family and medical reasons," and it prohibits employers from "interfere[ing] with … [an] employee's exercise or attempted exercise of her FMLA rights[.]" *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1241 (11th Cir. 2021). The FMLA permits an eligible employee to take "a total of 12 workweeks of leave during any 12-month period … [b]ecause of a serious health condition that makes the employee unable to perform the essential functions of the position of such employee." 29 U.S.C. §2612(a)(1)(D). An eligible employee who takes leave pursuant to the FMLA is entitled, on return from such leave, to be restored to the position held when the leave commenced or an equivalent position. 29 U.S.C. §2614(a)(1). "But if, after twelve weeks, the employee cannot perform an essential function of her job, her employer may choose to end her employment." *Ramji*, 992 F.3d at 1241 (citing 29 C.F.R. §825.216(c)).

The FMLA claim in Count III of the complaint is based on two distinct legal theories—interference and retaliation. Each theory will be discussed in turn.

21

*Interference*

To state an FMLA interference claim, an employee must show that (1) he was entitled to a benefit under the FMLA, (2) his employer denied him that benefit, and (3) he can demonstrate some harm from the alleged interference. *Id.*

To establish that he was entitled to a benefit under the FMLA when Defendant denied his request for additional leave, Plaintiff asserts that he was improperly required to take FMLA leave in June 2022 that deprived him of the opportunity to take that leave during his recovery from surgery in 2023. The Eleventh Circuit has not yet addressed whether an interference claim under an involuntary leave theory is actionable under the FMLA, *see Callaway v. Lee Mem'l Health Sys.*, 2022 WL 93534, at *5 (M.D. Fla. Jan. 10, 2022) (citing *Grace v. Adtran, Inc.*, 470 F. App'x 812, 816 (11th Cir. 2012)), but other circuits have.

For example, the Sixth Circuit has held that such claims are actionable "when an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that precludes her from working" and then "such leave is not available" when the employee seeks FMLA leave at a later date. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007). Thus, a prerequisite for such a claim is that the employee did not have a "serious health condition" at the time he was forced to take the FMLA leave.

Under the FMLA, a "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves … continuing treatment by a health care provider." 29 U.S.C. §2611(11)(B).  Here, it is undisputed that, on June 15, 2022, Plaintiff submitted a work status report to the OCSO completed by his medical provider indicting that Plaintiff was not physically able to complete the essential functions of his position due to continued back pain, and that he was not cleared to perform the essential functions of his position by his medical provider until July 13.  That evidence is unrefuted and shows that, between June 15 and July 13, Plaintiff had an impairment for which he was being treated by a medical provider—which meets the statutory definition of a "serious health condition" and justifies his placement on FMLA for that period.

In sum, because Plaintiff failed to show that he was improperly placed on FMLA leave in June 2022, he failed to show that he was denied an FMLA benefit he was entitled to when Defendant denied his request for additional FMLA leave in February 2023 after his eight weeks of remaining leave had expired.  Thus, Plaintiff failed to establish an FLMA interference claim based on an involuntary leave theory.

The Court did not overlook Plaintiff's argument that he believed he was taking advanced medical leave instead of FMLA leave when he was placed on leave in June 2022.  However, putting aside the fact that there is uncontradicted evidence that Plaintiff was told by Ms. James in a June 23 email that he was being placed on

FMLA leave, "the employer may require that the employee use his FMLA leave entitlement and his paid sick leave concurrently." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1205 (11th Cir. 2001). Thus, even if Plaintiff thought he was taking advanced medical leave, the OCSO could have required him to use his FMLA leave entitlement concurrent with the medical leave anyway.

*Retaliation*

"Under the FMLA, it is unlawful for an employer to retaliate against an employee because she engaged in activity protected by the Act." *Boan v. Fla. Dep't of Corr.*, 2024 WL 3084388, at *1 (11th Cir. June 21, 2024). Like the FCRA retaliation claim, to make out a prima facie case of FMLA retaliation absent direct evidence of discrimination, the plaintiff must show (1) that he engaged in a statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that a causal link existed between the adverse action and his protected expression. *Id.* If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to establish a legitimate, non-retaliatory reason for the adverse action which the plaintiff must then show is mere pretext for retaliation. *Id.* at *2.

The parties' arguments on the FMLA retaliation claim are the same as their arguments on the FCRA retaliation claim. Thus, Defendant is entitled to summary judgment on the FMLA retaliation claim for the same reasons that he is entitled to

summary judgment on the FCRA retaliation claim—i.e., there is no evidence from which a reasonable jury could find causation or pretext.

*    *    *

Accordingly, because Plaintiff failed to prove his FMLA violation claim under either an interference or retaliation theory, Defendant is entitled to summary judgment on the FMLA claim in Count III of the complaint.

**Conclusion**

In sum, because the undisputed evidence fails to establish that Plaintiff was medically cleared to return to work on March 14, 2023, the denial of his request for additional leave through that date (and the subsequent termination of his employment in accordance with OCSO policy after his leave expired and he refused to take a non-sworn position) did not violate the ADA, the FCRA, or the FMLA in any way.  Accordingly, it is

**ORDERED** that:

1.    Defendant's motion for summary judgment (Doc. 13) is **GRANTED**.

2.    The Clerk shall enter judgment in favor of Defendant and close the case.

**DONE and ORDERED** this 25th day of November, 2024.

**T. KENT WETHERELL, II
UNITED STATES DISTRICT JUDGE**